**Earl E. PIERCE, et al., Plaintiffs–Appellees,**

v.

**SECURITY TRUST LIFE INS. CO., Defendant–Appellant.**

**No. 90–1101 (CA–89–661–N).**

United States Court of Appeals,
Fourth Circuit.

Argued March 7, 1991.

Decided July 2, 1992.

As Amended July 22 and Sept. 3, 1992.

Conrad Moss Shumadine, Willcox & Savage, P.C., Norfolk, Va., (Randy D. Singer, Annemarie D. Clary, Kevin L. Keller, Norfolk, Va., Donald I.N. McKenzie, Joseph A. Sowell, III, Waller, Lansden, Dortch & Davis, Nashville, Tenn., on brief), for defendant-appellant.

Joseph Lawrence Lyle, Jr., Kaufman & Canoles, Virginia Beach, Va., for plaintiffs-appellees.

**24**

## OPINION

### PER CURIAM:

This case presents issues arising from an ERISA action brought by twelve retired employees of the defendant Security Trust Life Insurance Company ("Security") to contest an amendment which Security made to the employees' ERISA plan. In 1988, after the plaintiffs had retired, Security amended the ERISA plan to require the retiree employees to contribute, beginning as of January 1, 1989, a portion of the cost of their medical and hospital benefits plan. Security made this amendment pursuant to the power granted the employer under the plan to terminate, modify or change the terms of the ERISA plan. Plaintiffs paid the required contributions under protest, and later instituted this action in the United States District Court for the Eastern District of Virginia for a declaration of the invalidity of the amendment and for recovery of any contributions made by them under protest and by reason of such amendment. As there were no factual disputes, both sides moved for summary judgment, and the district court received written and oral arguments. By Order dated August 10, 1990, the district court found unlawful Security's amendment requiring the retired participants to contribute a part of the cost of their hospital and medical benefits. The court also ordered Security to reimburse plaintiffs for their contributions made subsequent to January 1, 1989, and to reinstate the prior non-contributing nature of the coverage. Security now appeals. We reverse.

### I.

In 1975, after Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1988), officials of Security executed pursuant to the ERISA statute two benefit plan documents naming Security as fiduciary with authority to control and manage the operation and administration of the Plan, including the authority to amend or terminate the Plan. The Plan itself provided that the employer could modify, change or terminate the benefits unilaterally. Prior to this action, the benefits plan had been amended approximately twenty times, including the amendment in 1978 whereby Security enlarged the coverage by providing free medical coverage to its retirees. It was this amendment which provided the basis for the plaintiffs' action. Security's Chairman stated of this amendment, "Though we know you understand that your Company cannot offset the erosion of inflation on your retirement income, this benefit is added to help and to show again our appreciation for your past service to [Security]."

Security never distributed the Group Plan to plaintiffs, but, in compliance with ERISA requirements, Security prepared and distributed in 1980 to all retirees and employees a Summary Plan Description ("SPD"), which set out for Security's employees and retirees their rights and benefits. The SPD did not advise the retirees or existing employees that the Plan's welfare ("Hospital and Medical") benefits were subject to modification, change or termination unilaterally by the employer. However, the SPD declared, "This booklet describes the essential features on your group medical plan as they apply to you, but it should not be understood to be a complete or detailed statement of your rights under the plan. If you have any questions about the plan, you should contact the Personnel Department."

In 1978 and for some years thereafter, Security distributed to the plaintiffs and other Plan participants annual booklets entitled "A Personalized Statement of [defendant's] Career Benefits Prepared Especially For: [the named employee]." These booklets included, under the heading "Sickness and Disability Income Benefits" a statement of such retiree's benefits under the Plan's health and hospital policy. On a page after that describing the health plan and under a separate heading of "Retirement Benefits," these booklets contained a projection of the named retiree's estimated monthly retirement benefits, which declared the benefits described in the section to be "100% vested." Moreover, these booklets stated, "Careful attention was giv-

en to the preparation of this summary. The benefits actually payable, however, are controlled by the terms and conditions of the various plan instruments on file in the Home Office. Booklets explaining the plan provisions have been furnished to you."

In 1984, Security provided employees, including retired employees, with a new SPD entitled "Your Group Insurance Plan." Unlike the 1980 SPD, this 1984 SPD advised employees that their Plan could be changed or terminated by the employer unilaterally. The language of the SPD relating the employer's power to modify the Plan included this statement: *"Plan Termination* Security hopes and expects to continue the Plan indefinitely. Every effort has been made to arrange the Plan so that it will meet future conditions. However, to protect [defendant] against unforeseen conditions, [defendant] reserves the right to change or terminate the Plan at any time."

After the Plan acquired a new insurance policy covering hospital and medical benefits in 1986, Security again distributed a booklet entitled, "[Defendant's] Medical Expense Insurance Plan," which provided in a boxed, bold, italicized note in the "Loss of Benefits" section:

*An amendment or termination may affect not only the coverages of active employees (and their covered dependents) but also former employees who retired, died or otherwise terminated employment (and their covered dependents) and of any covered persons who began a program of treatment or became hospitalized prior to the amendment or termination.*

Because medical insurance costs drastically increased between 1978 and 1988, Security decided in the latter year to amend the Plan to make it partially contributing, and to require retirees under this amendment to pay approximately 25% of the cost of the Plan—*i.e.,* either $30 or $95 per month, depending on whether the Plan was for individual or family coverage.[1] The plaintiffs objected to such changes and sued to void them. Upon motions for summary judgment by both parties, the district court entered its order granting judgment in favor the plaintiffs. Security has appealed.

## II.

The district court began its opinion granting summary judgment in favor of the plaintiffs by declaring that Security had in 1978 amended its medical plan to provide "free medical coverage" to its retirees, and had also issued at least five annual benefit summaries stating the terms and provisions of its ERISA benefits plan, which statements, according to the district court, "could be interpreted as stating that free retirement benefits [including non-contributory medical benefits] were '100% vested.'" The court further found that certain employees in Security's personnel department had told retirees that their "medical coverage [was] 'for life.'" According to the court's findings, Security did not mention in any communication to the retirees "its right to amend or terminate the plan" until the issuance of its "summary plan description ... sometime between 1984 and 1986." The court found that the employer's failure to provide notice of its right to amend the Plan until the 1984 SPD was a violation of ERISA which could not be remedied by a disclaimer. The court also found that Security did not take any action to amend the terms governing the medical benefits so as to require a contribution by the retirees until April 15, 1988.

On the basis of these findings, the district court concluded that Security had

---

**1.** The district court suggested that there was something "sinister" in this action by Security. However, the escalation in medical costs in recent years has caused even the most generous of employers to require, for the first time, some employee or retiree contributions towards these kinds of benefits. Indeed, I.B.M., an employer identified among the most benevolent employers in terms of employee benefits, has, after many years of providing noncontributory health benefits to employees, determined it was necessary to adopt many of the same measures which Security adopted in this case. *See* Milt Freudenheim, *A Generous Plan is Given a Trim,* N.Y. Times, May 12, 1992, at D2.

failed to comply with ERISA's statement and disclosure requirements ... [and] Security [had] compounded its malfeasance by providing employees with misleading annual benefit summaries which indicated that the retiree's benefits appearing on the page, including non-contributory medical benefits w[ere] '100% vested' ... [and] topped these actions off by telling employees who had questions about their plan to 'contact the Personnel Department,' Defendant's Exhibit 13, and then telling those who did that retirement benefits were provided by the company at no cost for the life of the retirees.

The district court opinion seems to assume, in conformity with existing authorities, that, even if there was a violation of the disclosure provision of ERISA by the employer, in order for a plan participant to recover damages for a violation of the employer of its duty of disclosure, the participant "must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description." *Govoni v. Bricklayers, Masons and Plasterers Local No. 5 Pension Fund,* 732 F.2d 250, 252 (1st Cir.1984). The district court appears to have avoided the necessity of finding reliance and prejudice by declaring that "in instances where the company wholly fails to inform its employees that their benefits are subject to change at the employer's whim, reliance and prejudice are to be presumed." The district court proceeded to conclude that "Security may choose to include the plaintiffs in future plan amendments *increasing* the level of medical coverage; it may choose not to as well. The company may not, however, condition the plaintiff's receipt of future medical coverage on contributions towards the cost of the plan." (Emphasis in original). The court ordered the company "to reimburse the plaintiffs for their contributions [made towards the cost of such medical benefits] and to reinstate the non-contributory nature of the plaintiffs' current medical coverage."

The district court opinion is the subject of this appeal.

### III.

All parties agree that decision herein is controlled by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1988). That Act requires that any employee benefits plan be based upon "a written instrument," 29 U.S.C. § 1102(a)(1). We agree with the district court, however, that it is not sufficient simply for the employer have a written plan. There are other specific obligations placed on the employer by the Act. One of these obligations relates to the notification that must be afforded the plan participants of their rights under the Plan. Congress felt that ERISA's predecessor legislation had failed to provide adequate notification of rights for the plan participants. The Senate Report on the Act identified as a source of congressional concern the inadequacy of effective notice of the rights of plan participants due of "the technicalities and complexities of the [the predecessor Act's] language"—language which was all too often "misleading or incomprehensible." [2] Congress intended to correct this deficiency, among others, in the new legislation. To accomplish this clearly articulated purpose, the Congress amended the Act to include the current section 1022.

Section 1022 requires the employer to prepare and distribute promptly to the employee-participants a "Summary Plan Description" (SPD), which booklet should provide the plan participants an "accurate and comprehensive" statement of their rights and obligations under the Act in "a form and manner" which could be "understood by the average plan participant." 29 U.S.C. § 1022(a)(1). Moreover, Section 1022 specifically provides what information is to be included in the SPD to be furnished the plan participant. Included among such specified information are the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). In essence, then, the employer, in establishing an ERISA plan, must (1) set forth the plan in

---

**2.** For expressions of these concerns in House and Senate Reports, *see* H.R.Rep. No. 807, 93d Cong., 2d Sess. 60 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4640, and S.Rep. No. 383, 93d Cong.2d Sess. 18 (1975), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4890, 4935.

writing, (2) provide each plan participant with an SPD "within 90 days" after the participant becomes such a participant, 29 U.S.C. § 1024(b), and (3) must state in the SPD the participant's rights under the plan in "accurate and comprehensive" language which can be understood by the average plan participant.

We agree with the district court that the courts, in construing these provisions of the Act, have uniformly held that the SPD was "the statutorily established means of informing participants of the terms of the plan and its benefits," *Alday v. Container Corp. of America*, 906 F.2d 660, 665 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991), and the "employee's primary source of information regarding employment benefits," *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir. 1990). Since the SPD was the "statutorily established" source of information to which a plan participant would look for a statement of his rights under an ERISA plan, the SPD would also appear to be the "source" of information on which a plan participant could rely. It would seem to follow that, if there was a conflict between the complexities of the plan's language and the simple language of the SPD, the latter would control. And such has been the holding of the decisions. *E.g., Heidgerd v. Olin Corp.*, 906 F.2d at 907–08. In *Heidgerd*, Judge Kease stated well both this rule and the basis therefor:

> Second, only the Booklet, not the Plan itself, was distributed to employees. The Booklet purported to summarize the Plan. ERISA and the regulations promulgated under it require that employees be given such summaries. *See* 29 U.S.C. § 1022 (1988) (company must furnish its employees with summary forms of benefit plans describing, *inter alia*, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits"); 29 C.F.R. § 2520.102–2(a) (1989) (summary description "shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the

plan"). Thus, the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supersede the terms of the Booklet would defeat the purpose of providing the employees with summaries.

*Id.*

Security asserts, however, that disclaimers in the 1980 SPD which it distributed to the plan participants made the Plan and its provisions controlling over the SPD.[3] It bases this argument on the following statement in the relevant 1980 SPD: "This booklet describes the essential features of your group medical as they apply to you, but it should not be understood to be a complete or detailed statement of your rights under the plan." As the district court says, this very argument has been made in numerous cases involving similar language, and has been repeatedly dismissed as ineffectual. The earliest case to this effect, which was cited and followed by the district court here, is *McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir.1985). In that case, the Court bluntly states, "It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." The court in *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988), reached the same conclusion: "This Circuit has decided that statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." In *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981–82 (5th Cir.1991), the latest reported circuit decision to address this argument, the court said:

> Under Continental's proposed rule the summary would not need to be accurate

---

**3.** Of course, this argument could not apply to the 1984–85 SPD because that document actually stated that the welfare benefits provided were

terminable unilaterally at anytime by the employer.

or comprehensive—if there were an ambiguity in the summary or an inaccuracy that put the summary in conflict with the policy, that ambiguity or inaccuracy would be cured by the policy itself. The result would be that before a participant in the plan could make any use of the summary, she would have to compare the summary to the policy to make sure that the summary was unambiguous, accurate, and not in conflict with the policy. Of course, if a participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all.

. . . .

... Like the Sixth and Eleventh Circuits, this Court holds that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern. Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary.[4]

However, what the district court opinion appears to overlook is that Security filed in 1984 and in later years SPDs which correctly notified the plan participants that the employer had the right unilaterally to terminate, change or modify the Plan and its benefits, and that not until 1988–89 did the company exercise this right to require the participants' obligatory contribution to the costs of medical and hospital benefits contained in the plan. The plaintiffs insist, however, that notifications given them through 1984, and subsequent documents of such rights were irrelevant because their rights to welfare benefits were "100% vested." This argument seems to have

been accepted by the district court. In support of this argument, the plaintiffs, as well as the district court, point to the summaries periodically furnished to the plan participants. These documents set forth the benefits, so far as relevant here, under two headings. These two headings appeared on separate pages of the document and carefully delineated the benefits available to the participants thereunder.

The first of these headings was "Hospital and Medical Benefits;" the second, "Your Retirement Benefits." The "Hospital and Medical Benefits" section gave the policy limits and general terms of coverage of the benefits provided. The "Retirement Benefits" section gave specific figures stating the exact amount of the *retirement* benefits for the indicated individual as of the date stated. There was one significant difference between the two statements of benefits: *The "Retirement Benefits" statement expressly notified the participants near the top of that statement that those benefits were "100% vested," whereas the "Hospital and Medical Benefits" statement included no such declaration of "vesting."* The implicit declared difference contained in the statement of these two classes of benefits was that the welfare benefits, unlike the retirement benefits, were not vested. Moreover, this crucial difference between the two classifications of benefits, as evidenced in the summaries, is in accord with the manifest purposes and language of ERISA itself—a fact which seems to have escaped the district court and the plaintiffs. As we said in *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 410 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (emphasis added) (citations omitted):

Under ERISA's vesting rules, only accrued benefits must be nonforfeitable.

---

4. The employer in this case cites our own case of *DeNobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989), as contrary to the rule enunciated in the above cases. We do not so read *DeNobel.* That case involved "nothing more than a dispute over the Vitro trustees' 'interpretations' of unclear language found in the plan documents" relating to the retirement rights of an early-retirement plan participant. 885 F.2d at 1187. The court held that "under *Firestone Tire &*

*Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80, the trustee's discretionary interpretation could only be reversed under an abuse of discretion standard for arbitrariness, and the case was decided on that basis." 885 F.2d at 1186–88. The reference to whether the plan or the SPD would normally prevail in case of conflict was not in real issue, and any comment on such a situation in the opinion was, at most, mere dictum unnecessary to the decision.

29 U.S.C. § 1053(a). With respect to the issues raised by these appeals, ERISA defines an accrued benefit as an "annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). The accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments. The Act was not designed to prohibit modification of these ancillary benefits. Rather, Congress believed that the "vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." ... *An employer may change such benefits without violating ERISA.*

*See also, Reichelt v. Emhart Corp.,* 921 F.2d 425, 429 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); *Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1045 (7th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). In *Reichelt,* the Court said:

ERISA governs two types of employee benefits plans: those that provide for "pension" benefits, *see* 29 U.S.C. § 1020(2), and those that provide for "welfare" benefits, *see id.* § 1002(1). In recognition of the expense of maintaining and administering employee benefit plans, Congress structured ERISA to impose the most stringent requirements in connection with pension plans and left the employer with considerable flexibility with respect to welfare plans. Thus, employee pension benefit plans are subject to elaborate accrual, vesting, and funding requirements. 29 U.S.C. §§ 1051–1085. On the other hand, welfare benefit plans, though subject to certain disclosure and fiduciary requirements, *see id.* §§ 1021–1031, 1101–1114, "are exempt from the more stringent ERISA requirements," and welfare benefits are thus unaccrued and nonvested.

"An unfunded severance plan is an "employee welfare benefit plan" under § 1002(1).... [A]n employer severance pay plan ..., which pays benefits on an ongoing basis to employees severed under certain circumstances, is an 'employee welfare benefit plan' under ERISA"[ ].

Since severance benefits are welfare benefits and an employee's interest in a welfare benefit plan is not vested, the employer has no continuing obligation to provide severance benefits; under ERISA, the employer has the right at any time to amend or terminate a severance pay plan.

921 F.2d at 429–30 (emphasis added) (citations omitted).

▪ Even assuming that the summaries do not support their theory that the "welfare benefits" in the plan were vested, the plaintiffs assert that oral statements of a supervisor that the "welfare benefits" were "for life" were reliable representations, for purposes of estoppel, that such benefits were vested. The district court agreed with this argument. This contention, though, runs counter to the provision of ERISA, requiring that all benefits plans under ERISA to be established and maintained pursuant to a written instrument. As the Court in *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986), put it, "[T]his requirement that ERISA plans be 'maintained' in writing precludes oral modifications of the plan; the common law doctrine of estoppel cannot be used to alter this result." *See also, Pizlo v. Bethlehem Steel Corp.,* 884 F.2d 116, 120 (4th Cir. 1989); *Musto v. American General Corp.,* 861 F.2d 897, 910 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Straub v. Western Union Tel. Co.,* 851 F.2d 1262, 1265 (10th Cir.1988) ("Following the lead of the Eleventh Circuit, we hold that no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan").

It would appear clear from this review of the applicable statutes and the relevant precedents that, since the medical and hospital benefits involved here were not vested, such benefits were terminable at will by the employer. The only theory on which the plaintiffs could base a claim is the omission from the SPD of a statement

clearly articulating the right of Security to terminate or change the plan unilaterally. But Security did not make any change in its hospital and medical benefits until January, 1989, and as of that time, Security had long since given the plan participants the required notice in the 1984 SPD.

So far we have accepted the district court's ruling that no change in the non-contributory character of the medical benefits could be effective prior to notice to the participants in compliance with an SPD. Under *Sutton,* 724 F.2d at 410, and *Reichelt,* 921 F.2d at 429, it is arguable that, since the medical benefits under the plan were not vested the employer could change such benefits without any prior notice of that right as a matter of law. This seems to be the purport of our language in *Sutton,* as previously quoted, and of the Second Circuit in *Reichelt,* also previously quoted. It is unnecessary for us, however, to reach that conclusion in this case. Following the distribution of Security's 1984 SPD, there was no valid impediment to changes in the benefits unilaterally by Security. And Security made no change in the non-contributory character of the medical benefits until 1988—changes which became effective in 1989. By the time that the 1988 resolution was adopted, and the required contribution by the retirees participants became payable after January 1, 1989, the right of Security to change the medical benefit provisions unilaterally was quite clear. Accordingly, the action of Security in requiring the retiree participants to pay a portion of the insurance premiums for their medical benefits under the plan accruing after January 1, 1989, was not a breach of the Plan on the part of Security since those benefits were not vested rights.

Moreover, as the district court said, the case law establishes that a plan participant "must show reliance and prejudice in order to recover for an employer's failure to comply with ERISA's statutory requirements in any event." *Govoni v. Bricklayers, Masons, and Plasterers Local No. 5 Pension Fund,* 732 F.2d 250, 252 (1st Cir.1984). The district court would gloss over this requirement by holding "that in instances where the company wholly fails to inform its employees that their benefits are sub-

ject to change at the employer's whim, reliance and prejudice can be presumed." There are at least two flaws in this reasoning. In the first place, we know of no authority for the position that when the burden of proving prejudice rests in the plaintiff, such burden may be presumed without any proof or reasoning. More importantly, there is no factual basis for finding prejudice or reliance in this case. The defendant never sought to collect any portion of the charges for medical benefits from the retirees until approximately four years after Security had provided such parties in its 1984 SPD notice that Security could unilaterally change the terms of the plan. Thus, all the contributions made by the plaintiffs were made years after the plaintiffs had received the notice to that effect as set forth in the 1984 SPD. Thus, there could be no right on the part of the plaintiffs to recover their contributions, and the plaintiffs cannot have suffered any prejudice since they had no vested rights in the medical benefits.

The judgment of the district court, therefore, is reversed and the cause is remanded to the district court with directions to dismiss the action.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*